## MURPHY V. PEOPLE.

1. Under Crim. Code ch. 25, § 21, providing that, in cases of homicide, "malice shall be implied where no considerable provocation appears, or when the circumstances of the killing show an abandoned and malignant heart," the fact of the use of a weapon or instrument calculated to destroy life is not a necessary condition precedent to the implication; but, where an assault is made on a woman with the hands and feet only, the accused being aware, from her condition, that such an assault might prove fatal, the implication arises, and a conviction of murder or voluntary manslaughter may be had.

2. Where, on an indictment for murder, the accused is convicted of voluntary manslaughter, he cannot be heard to say, on appeal, that such conviction is erroneous for the reason that no sufficient provocation was shown, and that under the evidence he should have been convicted of murder.

3. It is not error, on an indictment for manslaughter, for the court to refuse to give cumulative instructions specifying repeatedly each material ultimate fact, and telling the jury they must find, as to each, beyond a reasonable doubt.

4. On an indictment for murder, where there has been no attempt by the prosecution to show that the accused had ever been unkind to the deceased prior to the killing, it is not error in the court to refuse to admit cumulative evidence of acts of kindness by him.

5. Where a witness has testified that he is not in fear of giving his evidence, the admission of testimony by him that he was at one time in fear, though erroneous, is not ground for reversal.

6. On an indictment for murder, evidence that the accused repented the next day of his act, and was forgiven by the deceased, is inadmissible.

7. Error may not be assigned upon the refusal of the court to allow counsel for a prisoner to read the instructions of the court to the jury. Adverse comments upon instructions to the jury are not permissible. The manner and extent to which counsel may proceed in argument rests in the sound discretion of the court.

*Error to District Court of Arapahoe County.*

INDICTMENT for murder. The facts are sufficiently stated in the opinion.

Messrs. PATTERSON and THOMAS and I. WHITE, for plaintiff in error.

THEO. H. THOMAS, Attorney-General, for defendants in error.

ELBERT, J. The testimony leaves no doubt that the violence inflicted by the defendant upon the person of the deceased was the immediate cause of her death. The kicks with his boot upon her side and abdomen as she lay upon the ground, the bruises upon her body testifying to their force and violence, the ruptured liver beneath the bruises, and the three or four pints of blood in the abdominal cavity, as revealed by the autopsy, stand so closely connected and associated as to afford no room for reasonable doubt as to the cause of the death that so swiftly followed.

The defendant was indicted for murder. The jury found him guilty of voluntary manslaughter. The chief point urged by counsel for the prisoner is that "the verdict is contrary to the law and the evidence." The position, stated more specifically, is: (1) That, where the assault is made with the hands and feet, intent to kill will not be implied; (2) that there was an absence of provocation, one of the essential elements of voluntary manslaughter; that the verdict, for these reasons, should have been involuntary manslaughter.

If we turn to the Criminal Code (chapter 25, p. 297,

Gen. St.) we find murder defined as "the unlawful kill-
ing of a human being with malice aforethought, either
express or implied. The unlawful killing may be in-
flicted by any of the unlawful means by which death
may be occasioned." Passing over the statutory defini-
tion of express malice as not pertinent in this case, we
find that section 21 declares that "malice shall be im-
plied when no considerable provocation appears, or when
the circumstances of the killing show an abandoned and
malignant heart." It will also be noticed that the same
section declares that murder perpetrated by any act
greatly dangerous to the lives of others, and indicating a
depraved mind regardless of human life, shall be deemed
murder of the *first* degree. Section 25, defining involun-
tary manslaughter, declares that "where such involun-
tary killing shall happen in the commission of an
unlawful act which in its consequences naturally tends
to destroy the life of a human being, or is committed in
the prosecution of a felonious intent, the offense shall be
deemed and adjudged to be murder."

It is contended that while malice may be implied in
the two cases specified by the statute, namely, "when
no considerable provocation appears, or when all the cir-
cumstances of the killing show an abandoned and malig-
nant heart," that it can only be so implied when the
homicide is committed by the use of a weapon or instru-
ment calculated to destroy life; that, when the hands and
feet are alone employed as the means of assault, malice
will not be implied so as to warrant a verdict of murder,
nor will any intent to kill be implied so as to warrant a
verdict of voluntary manslaughter. The proposition can-
not be admitted in the unqualified terms of its assertion.
The doctrine, with its proper qualifications, is well stated
by Bigelow, J., in the case of *Com. v. Fox*, 7 Gray, 585:
"The court cannot sustain the broad proposition laid
down by the counsel for the prisoner, that, in the absence
of all evidence of express malice, there is no aspect of

this case which will authorize the jury to convict the prisoner of murder. It is undoubtedly true that in many cases, in order to prove implied malice in the sense in which that term is understood in the law, it is necessary to prove that the act of homicide was committed by the use of a weapon or instrument calculated to take life or inflict grievous bodily harm. As a party is held legally responsible for the natural or necessary consequences of his own unlawful act, the law implies malice where the circumstances of the homicide are such as to show that the act proceeded from an evil disposition, or a mind and heart regardless of social duty and fatally bent on mischief. This is proved, in many cases, by the use of weapons or other means which necessarily endanger life. But where death ensues from acts or means which, under the circumstances, could not have been supposed to endanger life, or to inflict great bodily injury, the law will not imply malice, because it cannot be reasonably inferred that the party charged intended the consequences which flowed from his act. If, therefore, death should ensue from an attack made with the hands and feet only, on a person of mature years, and in full health and strength, the law would not imply malice, because, ordinarily, death would not be caused by the use of such means. But the inference would be quite different if the same assault and battery were committed on an infant of tender years, or upon a person enfeebled by old age or worn out with disease. In such cases, the circumstances under which the act was committed would show a disposition quite as evil and malignant, and the use of means calculated to inflict as grievous bodily harm, as the employment of deadly weapons on a person in the full possession of his health and strength. So it has been held that the wilful exposure of a person laboring under sickness to a severe cold, whereby his disease was aggravated and death was occasioned, would be evidence of implied malice sufficient to warrant a conviction of murder.

1 Hawk. ch. 3, §§ 4, 5.  In like manner, a slight blow on the head of a new-born infant, which, if inflicted on an adult, would be harmless, but which necessarily would endanger the life and actually caused the death of the child, is proof upon which a jury might well find a party guilty of murder.  The real question is whether the circumstances of the homicide are such as to satisfy the jury that the party charged acted from an unlawful and evil design, with an intent to do grievous bodily harm, and that his acts were of a nature calculated to endanger life.  From such acts the law will imply malice.  In the present case, therefore, if the evidence satisfies the jury that the prisoner, at the time he committed the assault and battery on the deceased, knew, or had reasonable cause to believe, that she was sick and suffering from disease, and was thereby put in such a weak and feeble condition that his attack would endanger her life, or inflict on her great bodily harm, or hasten her death, it would justify the jury in finding implied malice, and convicting the prisoner of murder.  But if he was not aware of her sickness, and had no reason to suppose that his acts would do her material injury, or any harm beyond that which would be occasioned by similar acts to a person in health, there would be no sufficient evidence of implied malice; and, although the acts of the prisoner hastened the death of his wife, he could be convicted of manslaughter only.  *Macklin's Case*, 2 Lewin, Cr. Cas. 225; 1 East, P. C. 344."

Accepting the proposition of counsel for the prisoner that our statutes must be read and construed in connection with the rule announced in the foregoing case, we proceed to consider the evidence in this cause pertinent to its application.  The prisoner and the deceased had lived together for some four or five years before the latter's death.  She was the mistress of the prisoner, and about twenty-six years of age.  She had long been intemperate.  "During the year prior to her death, her

dissipation had been excessive. She was frequently seen reeling upon the streets. She fell upon the floor in saloons and upon sidewalks. She was boisterous and quarrelsome in public places, and policemen frequently took her home. She indulged in profanity, and but three months before her death, in one of her drunken frenzies, she shot at the defendant in his own house, the bullet passing through the rim of his hat, and lodging in the ceiling." The evidence discloses that the week before her death she was more or less intoxicated every day. Mrs. Ayers testifies that she was in bed almost every day of this week,— sick,— and that she complained of pain and difficulty in breathing. Her health was impaired and her body enfeebled by these vicious habits. Dr. Whitehill says that he treated her for chronic inflammation of the liver in the summer of 1883 in Leadville; that she was addicted then to the use of liquor to some extent; that she was a woman who was regarded as in delicate health, and as a chronic sufferer. On the evening prior to the homicide she had been on a drunken debauch. It is in evidence that, about 9 o'clock P. M., she went with a witness, Mrs. Ayers, to her home. She was under the influence of liquor when she started. Before going, she went for and procured a quart bottle of whisky. This she took with her, and upon reaching Mrs. Ayers' house she rapidly became more intoxicated. While attempting to pick up a ring which she had dropped, she fell upon her knees, hands and face, her face striking the floor. At half past 11 o'clock, Mrs. Ayers started home with her. She steadied her across the street, and saw her last going into the door of her house. Mrs. Ruckman testifies that she saw her after this out in the street. She was staggering; and, when Mrs. Ruckman last saw her, she was leaning against the gate-post. Mrs. Mason appears to have seen her later than this. It was after 12 o'clock when she (witness) went to her window, and saw the deceased in her room across the alley. Her face was red and swollen,

her eyes were blackened, and her hair disheveled. This was the last seen of the deceased until about 4 o'clock of the same morning, when she and the defendant were in the alley together, and when, as testified by Mrs. Mason, the violence was inflicted. The prisoner had full knowledge of the intemperate habits of deceased, and of her diseased and enfeebled condition resulting therefrom. There is no evidence to show that he knew the particulars of her dissipation upon the night of the homicide, but he knew that she had been drinking for several successive days prior thereto; and that he had every reason to know and believe that she was in a semi-intoxicated condition at the time of the homicide, suffering from the effects of a continued debauch, is apparent from his own statement. In answer to the question: "Do you recollect, when you returned and found that Mrs. Murphy was dead, saying, 'This is what I expected,' or words to that effect?" he said, "It had been running in my mind for some time that she was on these drunks. At times she was intoxicated. I considered her insane more than I did drunk from the effects of liquor. I presume I did say that or something else. She would always talk so; she would tell me, sometime, I would come home and find her dead. I am not positive that I used the language, but I might have said it. I know that feeling ran through my mind, and that is why I think probably I might have made that remark; for I thought, when I opened the window, and put my hand on her that morning before she got up, I thought then she was dead, because she had acted different from what she had ever done before." From the testimony it is evident that the deceased was in that enfeebled and besotted condition which borders on *delirium tremens*, and that the prisoner had full knowledge of it, as they were living together as man and wife. The prisoner asked her to get up, and let him in at the door; and while waiting for her to do so, and after going to the front door, and again returning

to the window of the bed-room, and again asking her, and evidently suspecting something wrong, he heard her raise the front window and get out. She screamed and ran out of the gate onto the sidewalk. Defendant caught her, and dragged her into the alley, choked her, threw her upon the ground, and, as she lay prostrate in her night-dress, kicked her upon her side and abdomen with his boot, and then dragged her, as Mrs. Mason says, either by her hair, or her night-dress, as the prisoner says, with his right arm around her neck, to the window, where he lifted the window and put her into the bed-room. The bruises upon the body of the deceased bore witness to the force and violence of the kicks given by the prisoner, and the ruptured liver immediately beneath one of the bruises left no reasonable doubt, under the evidence, as to the immediate cause of death.

Here, then, are the main features of this case. A drunken, besotted woman, her body enfeebled by her vicious habits, regarded by the prisoner himself as partially insane, wakened by him from a drunken sleep at 4 o'clock in the morning. With her mind evidently all confusion, and her nervous system all unstrung, she rushed into the street and screamed. The prisoner "grabbed" her, and pulled her into the alley, and either threw her down or she fell down. As she lay there on her back, with no clothing except her night-dress, the prisoner kicked her with his boot on the side and abdomen three or four times, and with such violence as to rupture the liver and cause her death. It is of no importance that the prisoner did not know that the deceased was diseased as to her liver, by its adherence to the walls of the chest and by "fatty degeneration." He presumably knew that she was a chronic sufferer, as stated by Dr. Whitehill. He did know of her general condition of weakness resulting from her excessive intemperance. Upon this point there is no conflict of evidence, nor is a question made respecting. And here it may be said that it must be remem-

bered that the deceased was a woman; that women are, as a rule, physically weaker than men; that she was lying on her back on the ground, unprotected even by clothing; that such position exposed her body to the full force and effect of the prisoner's assault; that his kicks were upon her side and stomach,— parts of the body more or less vital; so that, independent of any special weakness or sickness of the deceased, it would have been a question for the jury whether the assault of the prisoner was such as, in its consequences, naturally tended to destroy her life.

Section 25 declares, *inter alia*, "that where an involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, * * * the offense shall be deemed and adjudged to be murder." Here was an unlawful assault by the prisoner upon the deceased with his hands and feet alone. Whether the assault, under all the circumstances, was such as in its consequences naturally tended to destroy her life, was a question for the jury. If resolved by them in the affirmative, not only an intent to kill, but that malicious intent essential to murder, might be implied under the statute. In such a case the law deals with the party committing the unlawful act as though an actual intent to kill existed. It is the familiar proposition that a party will be held as intending, and legally responsible for, the natural or necessary consequences of his unlawful act. Hence we say, substantially in the language of the authority which we have quoted, that had the jury in the present case believed, under all the circumstances, that the prisoner, at the time he committed the assault and battery on the deceased, knew, or had reasonable cause to believe, that she was sick and suffering from her habits of intemperance, and was therefore put in such a weak and feeble condition that his assault upon her would (in the language of the statute), "in its consequences, naturally

tend " to destroy her life, they would have been justified, in the absence of features reducing the homicide to manslaughter, in finding implied malice, and convicting the prisoner of murder. Considering the physical condition of the deceased and the brutal character of the assault, had the jury found the prisoner guilty of murder, we should not have felt justified in disturbing their verdict on the ground that it was contrary to the law and the evidence. From the verdict of the jury, it is reasonably plain that while they believed that the prisoner knew, or should have known, that his assaults would endanger the life of the deceased, and that an intent to kill was justly implied from all the circumstances, that there were present such provocation and passion as called for a verdict of voluntary manslaughter instead of murder.

"In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." Gen. St. § 711. If the jury erred, it was in allowing the prisoner the benefit of this provision. While the deceased, according to the statement of the prisoner, had a pistol in her hand, there is no evidence that she attempted to use it. It appears from the evidence, however, that she had, some time prior to the homicide, shot at the prisoner, and it may be that the recollection of this and the sight of the pistol in the hands of the deceased was one of the causes of the prisoner's anger. We think the provocation largely lay in the fact that she was his mistress; that he regarded himself as responsible for her conduct; that she had for a long time been behaving badly; that her noisy and violent conduct in public, when in liquor, had long humiliated and irritated him; that upon this particular occasion she rushed out in the street in her night-clothes at an unusual hour of the night and commenced to scream, thus disturbing the neighborhood,

and bringing upon herself and the defendant, as he thought, extreme disgrace and reproach. His remonstrance with her at the time was, "Do you want to wake the neighborhood up and expose us?"

From all the evidence, it is reasonably plain that the prisoner acted under the impulse of passion, more or less intense, and under what he regarded as great provocation. At common law, words of reproach, however grievous, were not provocation sufficient to free the party killing from the guilt of murder; nor were indecent, provoking actions and gestures, expressive of contempt or reproach, without an assault upon the person. 2 Whart. Crim. Law, § 970, and cases cited. Provocations, unaccompanied by personal assault, were not infrequently recognized as sufficient; as where a man found another in adultery with his wife, or where the assault was upon a person sustaining some relation to the party killing, as father, son, or daughter. 2 Whart. Crim. Law, § 978 *et seq.* Mr. Wharton says: "The line between those provocations which will and will not extenuate the offense cannot be certainly defined. Such provocations as are in themselves calculated to provoke a high degree of resentment, and ordinarily induce a great degree of violence when compared with those which are slight and trivial and from which a great degree of violence does not usually follow, may serve to mark the distinction." 2 Whart. Crim. Law, § 983. We do not see that the provisions of our statute admit of the recognition of a provocation less in degree than that recognized as sufficient at common law. While the provocation, as shown by the evidence in this case, is not, in our opinion, sufficient in law to reduce the crime of the prisoner to manslaughter, we are not prepared to say that the prisoner may avail himself of an error in his favor, which, if allowed, would result in his acquittal of any of the grades of homicide. He cannot be again tried for murder; and if, as counsel contend, it is illogical and unphilosophical to say that the

prisoner may be convicted of voluntary manslaughter when the evidence shows that he was guilty of murder, it is equally illogical and unphilosophical to say that he may be convicted of involuntary manslaughter under the same state of facts. It is no defense to an indictment for manslaughter that the homicide alleged appears to have been committed with malice aforethought, and was therefore murder; but the defendant may in such case be properly convicted of the offense of manslaughter. 2 Whart. Crim. Law, § 932; *Commonwealth v. McPike*, 3 Cush. 181. It is a familiar rule that, where a minor offense is included in a greater, the defendant may be acquitted of the latter and convicted of the former. Of the sufficiency of the provocation and passion that reduce a homicide to the grade of manslaughter, the jury, under proper instructions from the court, are the judges. Under our statutes they are required to designate in their verdict the grade of the offense. We are unwilling to disturb their verdict in this case on the ground assigned.

We have carefully considered the objections made to the instructions given by the court. We do not think it would serve any useful purpose to review them separately and at length. We do not see that they could have conveyed to the minds of the jury any incorrect views of the law applicable to the facts of the case. We do not see that they were in any respect unfair to the prisoner. The objection to the first instruction, that it did not state the defense of the prisoner fully, and that the jury may have been led to disregard other possible theories of defense, is merely speculative. There is no doubt in our minds that the jury, under the instructions given by the court, duly considered the prisoner's case in all of its aspects. The fourth instruction is based upon the statutory provision that "where an involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being,    *    *    *    the offense shall be deemed and

adjudged to be murder." The instruction was warranted by the evidence. If it be true of this instruction, as urged by counsel for the prisoner, that its language is such as to lead the jury to believe that his crime was murder and not manslaughter, it is clear, from their verdict of manslaughter, that the prisoner was not prejudiced by the instruction. The same may be said of the objection to the fifth instruction. If, as claimed by counsel, it was calculated to mislead, the verdict of the jury shows clearly it did not mislead in the manner claimed by counsel. These, as most of the objections urged against the instructions, rest in conjecture of possible prejudice. The seventeenth instruction, to which objection is made, was correct in law, pertinent to the case and fair to the prisoner. The modifications made by the court to the instructions prayed were properly made. The full effect of the modifications was to apply more fully and fairly the law to all the facts of the case. The instructions prayed by the defendant, and refused by the court, had already been substantially given by the court in various forms. It is not error to refuse to give cumulative instructions specifying repeatedly each material ultimate fact, and telling the jury that they must find, as to each, beyond a reasonable doubt. We think that the instructions given by the court, in a reasonably full, fair and plain manner, gave the law of the case to the jury, and this is all that can be required. But few convictions for crime can be sustained if every verbal criticism of instructions is to prevail, and speculative theories of possible prejudice are to be accepted as grounds of reversal.

The twentieth, twenty-second and twenty-third assignments of error go to the refusal of the court to admit certain testimony showing that the prisoner, upon a given occasion, a month or more prior to the homicide, was kind to the deceased; and also to the refusal of the court to allow a witness to answer the question: "Did

you, in the course of your visits, have an opportunity to know of the manner in which she was provided with the different articles of wearing apparel?"

"On a charge of murder, expressions of good will and acts of kindness on the part of the prisoner towards the deceased are always important evidence as showing what was his general disposition towards the deceased, from which the jury may be led to conclude that his intentions could not have been what the charge imputes." 1 Whart. Crim. Law, § 635.

While this is undoubtedly the rule, the evidence offered might well have been excluded on the ground that it was cumulative only. There was no effort upon the part of the prosecution to show that the prisoner, prior to the homicide, had ever been otherwise than kind to the deceased, or that he had ever failed in any way to properly support and supply her with anything necessary for her comfort. The defense had already been allowed to abundantly prove that the treatment of the deceased by the prisoner, prior to the homicide, had been kind, and that he supplied her well with food and clothing. No issue was made touching this, and it cannot be said that the prisoner was prejudiced by the refusal of the court to allow further testimony upon a point not contested by the prosecution. Whether such evidence would be admissible on a charge of manslaughter we do not decide.

It is objected that the witness Mrs. Mason was allowed to answer the question, "Have you not expressed yourself as being in fear of testifying?" her answer being, "Yes, sir; I did at one time, I think." Such testimony was clearly not pertinent. The witness had already in this connection answered that she was not under any fear of testifying. That she had once expressed such a fear was unimportant. This was substantially all the testimony on this point. Counsel do not appear to have pursued the subject, nor was it sought in any manner to

connect the prisoner with her fear. While the evidence was not pertinent, to say that it in any manner misled or prejudiced the jury against the defendant would be to indulge in conjecture. It must be treated as an indifferent thing, and not as substantive ground for reversing the judgment of the court below.

The evidence that the deceased, the next day after the assault, greeted the prisoner affectionately, and kissed him and he her, was not pertinent, and was properly excluded. The fact that the prisoner repented his assault, and the deceased forgave it, could not affect the sentence the law was called upon to pronounce.

Nor was there any error in the refusal of the court to allow counsel for the prisoner to read the instructions of the court to the jury. The instructions had already been read to the jury, and it was not necessary to re-read them for their information. If counsel desired to read and comment adversely upon them to the jury, we know of no practice that permits it. If he desired to read them for his own information, for the purpose of familiarizing himself with the law of the case as given by the court, with a view of adjusting his argument thereto, it rested in the sound discretion of the court to say in what manner and to what extent he should proceed.

We have thus noticed substantially all the points argued by counsel which are properly presented by the record and which call for notice. The prisoner is accused of a grave offense, and we have given to his case that serious consideration which every such case demands. We think that he has had a fair, impartial trial; that no serious errors affecting, in any substantial manner, his rights, were committed; and that the jury impaneled to try him took the most favorable view of his case admissible under the evidence.

We therefore feel it our duty to affirm the judgment of the court below.

*Affirmed.*