No. 20,120.

BURNELL GENE STAFFORD *v.*
THE PEOPLE OF THE STATE OF COLORADO.
(388 P. [2d] 774)

Decided January 27, 1964.

MR. ALEX STEPHEN KELLER, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mrs. AUREL M. KELLY, Special Assistant, for defendant in error.

*En Banc.*

Mr. JUSTICE HALL delivered the opinion of the Court.

ON May 4, 1961, a jury found the defendant guilty of murder in the first degree and he was sentenced to life imprisonment. He is here by writ of error seeking reversal and discharge.

There is no conflict in the testimony or evidence, the material and essential portions thereof consisting of verbal statements made by the defendant in conversations with law enforcement officers and in three written statements signed by the defendant which were admitted in evidence without objection.

The defendant, his wife Blanche, each about thirty years of age, and their four children had resided in Adams County for several years prior to the date on which the murder is alleged to have taken place, their residence on June 6, 1957, and for about a year prior thereto being at Dupont, Adams County. The defendant was a good father and husband. Their home life appears to have been normal, with a few family quarrels of minor significance. The defendant and Blanche were in good health and happy. There is nothing in the record to in-

dicate that either husband or wife harbored or enter-
tained any ill will or animosity toward the other.

On June 6, 1957, and for some time prior thereto, the
defendant had two full-time jobs. He worked at Gates
Rubber Company from 11:00 P.M. until 7 A.M., and at
Montgomery Ward from 8:00 A.M. until 5:00 P.M.

On the night of June 5, 1957, the defendant went to
work at Gates at 11:00 P.M. and worked until 7:00 A.M.
on the 6th; he then went to Montgomery Ward and
worked there from 8:00 A.M. until 5:00 P.M., and from
there went home, arriving at about 6:30 P.M. on the 6th.

Evidence dealing with occurrences on the night of
June 6th and the hours immediately following midnight
of the 6th comes from verbal and written signed state-
ments of the defendant.

The defendant's written and signed statement, dated
November 14, 1960, is as follows:

"I arived home at about 6:45 on the evning of June
6th 1957 and had supper with my family and right after
supper went right to bed at about 7:00 and went right to
sleep i don't know just what time it was when my wife
come in and sat on the bed and woke me up and said
something about me quiting one of my to full time jobes
and something else that i can't recall we did have a few
words and i got mad and rased up and swong at her with
my left hand and struck her on the neck and she got up
kind of stuped over and gasping and choking for air and
went out the door and i thought that she would be al-
right i went back to sleep and woke up at 11:15 wonder-
ing why she hadn't woken me to go to work and got up
and found her lying on the floor i felt of her and she was
cold i new she was dead and i wraped her in a bed sheet
and put her in the trunk of the car and took her out and
burried her."

Other statements of the defendant were to the effect
that on discovering his wife's body he "got scared," put
her body in the trunk of his car and drove to a field near
Keenesburg, some thirty-two miles distant, dug a grave,

placed the body therein, covered it and returned to Dupont at about 1:15 A.M., got a baby sitter from her home, which home was about fifteen minutes from his home, and took her to his home, left her in charge of the children and checked in for work at Gates at 2:48 A.M. on the 7th.

In the last of the three statements signed by the defendant appears the following:

"Q. Mr. Stafford, do you think the blow you inflicted upon your wife was the cause of her death? A. Well, it must have been. That's the only thing I can figure out."

The foregoing is the material evidence which sheds light on the death of Blanche and the circumstances surrounding the same.

Following the events of the nights of June 6 and the early morning hours of the 7th (probably one or two days thereafter), the defendant contacted Blanche's relatives in Nebraska by telephone and asked if Blanche was there, and told them that he and Blanche had an argument and that she had "walked off," and that he had reported it to the authorities (an untruth).

On June 13, 1957, the defendant first reported to law enforcement officers in Adams County that Blanche was missing. On June 28 he terminated his employment at Gates and left Dupont on the 29th, abandoning the four children who were turned over to relatives of Blanche.

In December 1957, the defendant was in jail in Rapid City, South Dakota. There he had stated his name was Norman Sutton.

On February 24, 1958, the defendant was received at and incarcerated in the Wyoming penitentiary at Rawlins, Wyoming, under the name of Norman Sutton.

On February 24, 1958, two men from the Adams County sheriff's office went to the Wyoming penitentiary and interviewed the defendant. At that time the defendant had in his possession Blanche's gold watch; he then signed the first of three statements setting forth the events of June 6-7, substantially the same as set forth on

November 14, 1960, and again on November 15, 1960. Armed with this information the officers promptly endeavored to locate the grave, but without success.

On March 5, 1958, the officers returned to Rawlins and further questioned the defendant who, at that time, told them he had thrown the body in a reservoir located in the general area where he had previously stated he had buried her.

On April 7, 1958, the defendant wrote a letter from the Wyoming penitentiary directed to Blanche's sister in Nebraska, stating that Blanche was not dead, that she had "just run off"; that while in Dupont he had, on June 26, 1957, received a letter from her mailed from Sturgis, South Dakota; that he had seen her twice in Sturgis in August 1957, and that he wanted to bring her back with him but she would not come.

On October 31, 1960, the Adams County officers returned to Wyoming and again interviewed the defendant, who then told them that Blanche was still alive.

On November 1, 1960, Wyoming released the defendant to the officers, who returned him to Adams County.

On November 10, 1960, the defendant agreed to help the officers find the grave, and several trips were made for that purpose. On the night of November 11, 1960, with the aid of the defendant, the location of the grave was discovered and the body was removed from the shallow grave in which the defendant had placed it, and turned over to the coroner of Weld County who delivered it to Dr. Ogura of the Denver coroner's office on November 13, 1960.

An information charging the defendant with first degree murder was filed November 18, 1960, the defendant was arraigned November 21, 1960, and entered a plea of not guilty. The matter was continued until December 6, 1960, for setting. On December 6, 1960, the case was set for trial commencing on April 27, 1961.

On December 8, 1960, the defendant escaped and was captured and returned to jail on the same day.

Trial was had, commencing on April 27, 1961, and on May 4, 1961, the jury returned its verdict finding the defendant guilty of murder in the first degree and fixed the penalty at life imprisonment.

Dr. George I. Ogura, employed by the City and County of Denver as a coroner's pathologist, examined the remains, which he described as "a mummified shell of the body," seeking to determine the cause of death. His examination did not reveal the cause of death.

In answer to a hypothetical question, Dr. Ogura testified that a blow such as that described by the defendant in his statement as having been struck could cause death.

On return of the verdict of guilty of first degree murder, the defendant was granted ten days in which to file a motion for a new trial and within the time allowed he filed a motion setting forth as grounds therefor:

1. That the evidence in the trial was insufficient to warrant submitting the case to a jury, because the People failed to establish the cause of death.

2. That it was error for this court to submit instructions as to first and second degree murder to the jury.

This motion was argued and denied and the defendant sentenced to life imprisonment.

We conclude that the evidence presented was sufficient to warrant the trial court in submitting to the jury the question as to whether Stafford's assault on his wife was the cause of her death.

We conclude that the record contains no evidence that the assault was committed "with malice, aforethought, either express or implied." There is nothing in the record before us to indicate beyond a reasonable doubt or at all that the defendant ever had "that deliberate intention unlawfully to take away the life of a fellow creature [his wife] * * *" or that "all circumstances in the killing show an abandoned and malignant heart."

We find nothing in the record to show plan, premeditation, deliberation, intention to kill, or any evil intention

of such dimensions as to point to an abandoned and malignant heart.

The blow was struck by the defendant on his being aroused from sleep; probably struck in anger, but certainly without plan, deliberation or premeditation.

A blow with a fist and a fortiori with the open hand is not calculated to cause death to a person in good health and of Blanche's age; death is not the natural consequence of such a blow.

In *McAndrews v. People,* 71 Colo. 542, 208 Pac. 486, the defendant had with his fists administered a severe beating to his victim and the victim died from a skull fracture. On reversing a second degree murder conviction, this court said:

"To make the killing murder, it must have been perpetrated with malice. Ordinarily a blow with the fist does not imply malice, an intent to kill.

"In *Murphy v. People,* 9 Colo. 435, 13 Pac. 528, this court quotes with approval from *Commonwealth v. Fox,* 7 Gray, (Mass.) 585, as follows:

" 'If, therefore, death should ensue from an attack made with the hands and feet only, on a person of mature years, and in full health and strength, the law would not imply malice, because, ordinarily, death would not be caused by the use of such means. But the inference would be quite different if the same assault and battery were committed on an infant of tender years, or upon a person enfeebled by old age or worn out with disease.'

\* \* \*

"A recent case on this subject is *People v. Crenshaw,* 298 Ill. 412, 131 N. E. 576, 15 A. L. R. 671, wherein the facts are strangely similar to those of this case, and the law announced, therefore, peculiarly applicable. Death was the result of a blow struck by defendant with his fist only. He was found guilty of murder. The facts were in substance that defendant struck the deceased after a quarrel, during which defendant asserted to deceased that for two cents he, defendant, would kill him then

and there. The court, in discussing the law applicable to the facts, said:

" 'The circumstances which distinguish murder from manslaughter have been passed upon by this court in many cases. Malice necessary to constitute a killing murder is presumed where the act is deliberate and is likely to be attended with dangerous or fatal consequences. (Citing authorities.) Death or great bodily harm must be the reasonable or probable consequence of the act to constitute murder. (Citing authorities.) The striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences, and no inference of an intent to kill is warranted from the circumstances disclosed by the proof in this case.'

"The court recognized, however, that there might be circumstances surrounding such a homicide from which an inference of malice would be proper."

█ The fact that the defendant buried the body, repeatedly lied concerning the disappearance of Blanche, went under an assumed name and, while awaiting trial, escaped from jail, was properly submitted to the jury as evidence of guilt and consciousness of guilt, but the same does not serve to supply the missing element of malice.

In *State v. Foster,* 130 N. C. 666, 41 S. E. 284, it is stated:

"\* \* \* The flight of a person immediately after the commission of a crime \* \* \* is a circumstance establishing his guilt, \* \* \*. In this case there were a number of eyewitnesses to the fact, and, besides, the prisoner's counsel had admitted the killing, and that the prisoner was guilty of murder in the second degree. This being so, we are entirely unable to see why the attention of the jury should have been specially called to the prisoner's flight in the charge of the court, and told that this was a circumstance that they must consider, in connection with the other evidence, in making up their verdict. We entirely fail to see how it shows or tended to prove

deliberation and premeditation on the part of the prisoner, and that was the only matter the jury had to consider, as it had been admitted that the prisoner was guilty of murder in the second degree."

In *State v. Steele,* 190 N. C. 506, 130 S. E. 308, the court followed its reasoning in *State v. Foster,* supra, and stated:

"Subsequent acts, including flight or hiding the body, or burning the bloody clothes and otherwise destroying traces of the crime are competent on the question of guilt. * * *. The basis of this rule is that a guilty conscience influences conduct. * * *.

　　　*　　*　　*

"Flight is not evidence of premeditation and deliberation. * * *."

█ There being no evidence of malice, premeditation, deliberation, intention to kill, or killing showing an abandoned and malignant heart, it was error to submit to the jury instructions defining murder and forms of verdict whereby they could find the defendant guilty of murder.

The judgment is reversed and the cause remanded for further proceedings consistent with the views herein expressed.