[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: SUPPORT OBLIGATION
In this case the defendant admitted paternity before trial on this issue was to begin. The question before the court is the appropriate amount of support for the minor child.
At the hearing on this matter it was established that the child was born on December 29, 1983. For over several years after the child's birth the defendant contributed annually between $50,000 and $100,000 to the support of the child and mother. The CT Page 3930 mother and the defendant lived together off and on between 1985 and 1989 but never married. In 1989 they stopped living together — Ms Kirker pointed to the defendant's gambling problem and mounting legal difficulties. The defendant, however kept in frequent contact with the child and sent checks of $2400 per month to the mother until May or June of 1995. Additional payments were apparently made for medical expenses and incidentals. This payment of $2400 was for the support of the child. After the defendant and Ms. Kirker stopped living together they had no further romantic involvement and he had no obligation, of course, to provide any funds to Ms. Kirker. In June 1995 the defendant told Ms. Kirker he was reducing his payments to $1200 and she would have to get used to that. It should be noted that the child has a serious chronic medical condition but no evidence was presented at the hearing of this matter as regards to any specific medical, educational or other expenses that are and will be necessitated because of that medical condition. The defendant in October 1995 in response to interrogatories indicated that he was a diabetic and recently had had heart bypass surgery. He also has a support obligation of $2000 a month to his ex-wife. The defendant himself receives social security payments and the child who is the subject of this litigation in behalf of the defendant receives $144 per week through social security.
The defendant purchased a house in Pomfret shortly before the child was born where he and the mother and child lived until 1989. The house has four bedrooms and an inground pool. The home is approximately 4400 square feet and is situated on a 7 acre lot. The house was put in trust in July 1995 naming the child as the sole beneficiary of the trust. In her financial affidavit the mother has estimated the fair market value of the house at $350,000 but in 1997 listed it with a real estate agent for between $500,000 and $600,000.
The mother, Ms. Kirker, is a licensed insurance agent and was successful in that pursuit — in 1991 or 1992 Prudential gave her money to open her own office and she was a member of the Million Dollar Round Table for a couple of years. She no longer sells insurance but does collect referral fees. Ms. Kirker owns a restaurant in Putnam and works there from zero to forty hours per week. A friend of Ms. Kirker lives in the Pomfret house with her and the child; she pays no rent but contributes to household expenses. Ms. Kirker receives $185. per month for the support of another child, who also lives in the house, from the father of CT Page 3931 that child.
His health problems and mounting legal difficulties and expenses did not prevent the defendant, Mr. Amata, from living and continuing to live a lavish life style in the 1990's. Testimony was presented that in February 1997 he placed several thousand dollars as a bet at the Foxwood Casino and ran his winnings up to $50,000.
Ms. Kirker and the child visited Mr. Amata twice between 1992 and 1995. He lived in a condo worth $300,000 and said he spent $100,000 on interior decoration. The condo was sold in late 1993 or early 1994. Mr. Amata bought the condo in perhaps 1992 and told Ms. Kirker he put it in a business partner's name because of problems he was having with the IRS. Ms. Kirker visited Mr. Amata in 1994. He by then had built a villa which he indicated cost $1 million dollars. He told Ms. Kirker that this time he "had done it right" — he'd put the house in his daughter's name. At that time he also was in possession of a BMW and a Mercedes convertible. There was also testimony from the administrator of a local country club that he paid annual dues of approximately $2000. This allegedly seriously ill man was there very frequently in 1997, sometimes on a daily basis. He is current with his charges. He ran up one monthly bill of $1700 dollars in 1996. In October 1997 he ran up a bill of over $500 to use a recent example of his monthly spending at the club. He paid his club bills by cash prior to 1997; more recently his daughter has sent in checks for expenses incurred.
The interesting thing to note is that the $2400 monthly payments to Ms. Kirker, the new villa, the gambling and expenses all occurred during times when Mr. Amata had his alimony obligations, his problems with the IRS and government investigations and his health problems which he disclosed in an October 1995 interrogatory response. On October 7, 1994 Mr. Amata paid his lawyers $50,000 to represent him on these and other matters. A December 1997 statement filed by his lawyer indicates that because of his "circumstances" Mr. Amata was not able to come up with another $20,000 for representation in a matter not related to this case but the statement was prepared December 4th
and the demand for the $20,000 was only made in October 1997.
It should also be noted that due to his legal difficulties Mr. Amata has failed to file any financial documents or affidavits with the court; he has relied on his privilege, which CT Page 3932 he certainly has a right to claim, under the Fifth Amendment to the United States Constitution.
Ms. Kirker has submitted an affidavit in which she indicates her net weekly income from employment is $192, she also listed the $144 social security payment she receives for the child and the $185 social security payment for the other child. Her total net weekly income is $521. She indicates her total weekly expenses are $1766, over $850 dollars of which represent mortgage or car loan payments. She lists assets of $283,198 dollars of when $236,882 represents equity in a house and $15,000 equity in a motor vehicle.
Counsel for the defendant has made several valid points in her brief and the legal principles she refers to are quite correct. The child support guidelines set forth in § 46b-215(b) of the general statutes must be considered in all determinations of child support, Glinski v. Glinski, 26 Conn. App. 617, 625 (1992). Indeed the guidelines create a rebuttable presumption that the amount calculated under them is appropriate and reasonable.Draper v. Draper, 40 Conn. App. 570, 572 (1996). Although the guidelines need not be followed if their application would be inequitable, the court must first determine the support appropriate under the guidelines, Favrow v. Vargas, 231 Conn. 125
(1994); also as the defendant notes any deviation of more than 15% from the guidelines is substantial, id page 29. In fact the guidelines limit the broad discretionary powers of judges in the child support area. The court in Favrow rejected a liberal reading of the deviation criteria from the appropriate guideline amounts, id pp. 714-15. The defendant further notes that as said in Glinski at 26 Conn. App. at page 623 that "while . . . sworn statements have great significance in domestic disputes . . . nothing in Practice Book § 463 (now § 1231) even remotely suggests that the failure of a party to submit a financial affidavit compels the court to view the evidence most favorably to the party who submits an affidavit. While the trial court may certainly draw adverse inferences from the failure of a party to submit the required financial information, it is under no obligation to do so. . "
After having paid all due deference to the child support guidelines the fact remains that Mr. Amata did not submit any of the affidavits or documentation necessary to make appropriate calculations under the guidelines. The defendant notes in his brief that the monthly $1200 he offered Ms. Kirker in June 1995 CT Page 3933 was nearly at the top of the guideline range of $327 per week. But the point is that within the statutory scheme providing for child support guidelines there is an explicit statutory section providing for deviation from the guidelines in the appropriate case, § 46b-215a-3. True, the figure of $327 lies at the top of the guideline range but the amount of support calculated under the guidelines is only "presumed" to be the correct amount to be awarded. This presumption can be rebutted by a specific finding that application of the guidelines would be unfair and inequitable in a particular case. Deviation from guideline standards is appropriate where the parent has resources that are not included in the definition of net income such as substantial assets or earning capacity. Deviation can be allowed based on other equitable factors. Failure to submit an affidavit does not compel a court to draw adverse inferences against the parent who fails to do so and it certainly does not compel the court to view the evidence most favorably to the parent who has submitted the appropriate affidavit. But even where a parent fails to submit the appropriate affidavit, the court still has the responsibility of ascertaining the resources that might be available to that parent to determine whether guideline criteria are appropriate[1]or deviation from suggested guideline amounts is more equitable even at a figure beyond the top of the guideline range.
The point here is that up until May or June 1995, Mr. Amata was making monthly payments of $2400 per month. He had been making these payments despite having incurred a sizeable legal bill some six or seven months previously and despite ongoing health and legal problems. Not a scintilla of evidence has been offered to indicate that any financial, legal or health adversities which he suffered were the actual factors that made it necessary for him to reduce the payments he had been making and if that was so why it was so. The defendant makes the interesting argument that in 1997, even if his gambling winnings of $50,000 are taken into account and the $6,000 he spent at his country club plus the Social Security he received, that "would not even place Mr. Amata's income at the top of the child support guidelines." (Page 12 of post trial brief). But the court cannot be forced into taking a snapshot view of what assets or earning capacity this man might have. The real point is that, to win the $50,000 at the casino, he had to lay down a $4,000 bet. He in fact spent thousands of dollars a year at his country club. In 1992 or 1993, he was living in a condo worth $300,000 and spent $100,000 on an interior decorator. He had a villa built worth $1 million. True, as defense counsel opines, there may be CT Page 3934 a mortgage on the villa, but Mr. Amata has not told us about it and his gambling and country club expenditures indicate he would have no trouble meeting mortgage payments. All of these expenditures, including his possession of expensive cars, indicate to the court that this man has substantial financial assets and/or earning capacity and the court can reasonably infer that he, at the very least, can make support payments for this child at least equivalent to what he was making prior to June 1995.
Interestingly, in June 1995 he offered to pay $1200 a month. If his $4000 ante for the bet in 1997 and his $6000 country club expenditures are taken into account, they added together would almost allow him to get back up to $2400 for 1997 — the court has no reason to believe that would not be true for other years. Suffice it to say that nothing behind the policies set forth in the guidelines requires a court to abandon common sense or prevents a court from concluding that a man who spends heavily on gambling and country club dues, lives in an elegant home and has possession of expensive cars also has substantial other income or assets allowing him to maintain this lifestyle and pay substantial support to his child.
The court finds that pursuant to § 46b-215a-(3)(a) of the Child Support Guidelines that such guidelines are inapplicable or inappropriate.
 (1) The defendant has substantial resources that are not and cannot be included in net income because he has failed to disclose his financial affairs. Because of his pattern of expenditures which indicate a ready access to cash resources which appear to be under only the nominal control of others but in fact in his control and because of his access to real property in excess of $1 million only nominally under the title or control of others, the court can conclude the defendant has such resources as would warrant a deviation from the guidelines.
 (2) The child has a chronic medical condition. The present and future expenses for treating such condition have not been established but at least the condition warrants the conclusion that medical health insurance be maintained for the child. CT Page 3935
 (3) The absence of testimony or other evidence from the defendant based on his invocation of his Fifth Amendment privilege can be considered an "equitable factor" under the statute at least in the sense that it makes it equitable for the court to consider large expenditures for specific non-necessary items and expenditures on living arrangements and life style as indicia of access to and control of substantial assets warranting a deviation from or a conclusion that the support guidelines are not applicable.
 The court makes the ancillary conclusion that his approach does not impinge on the defendant's exercise of his Fifth Amendment rights or penalize him for exercising such rights since he has an ongoing obligation to support his child. That is, because of the assertion of the Fifth Amendment privilege claim the court does not have access to financial affidavits and statements to help make certain determinations under the guidelines and to consider deviations from those guidelines. But the defendant still has an obligation to support his child and, in circumstances where the privilege is claimed, a court should be able to examine other indicia of income and assets besides affidavits such as expenditures and the value of assets under a party's control. That involves no infringement on constitutional rights worthy of being recognized in light of the fact that a child must be supported and furthermore it recognizes the fact that the privilege against self-incrimination is meant to be a shield not a sword created to ignore or destroy the obligations one owes to other people, particularly one's child, not the government.
Pursuant to the foregoing discussion and findings by the court the following orders are entered:
 (A) The defendant is ordered to pay child support of $2400 per month retroactively to June 1, 1995 when he stopped paying. This amount shall be payable to December 1, 1997 when the plaintiff began receiving social security benefits for the child.
 (B) In light of the weekly social security benefits for the child of $144 which total $576 on a CT Page 3936 monthly basis, monthly child support payments of $1800 are awarded prospectively until the majority of the child.
 (C) The defendant is ordered to continue to maintain and keep in full force and effect Prudential Life Insurance Policy number 9782336 on the life of the defendant for the benefit of the minor child.
 (D) The defendant is ordered to reimburse the plaintiff for all insurance premiums paid on this policy since the commencement of the action. The defendant is ordered to maintain Blue Cross, CMS and Major Medical health insurance of the reasonable equivalent thereof for the benefit of the minor child for so long as she is a minor.
 (E) The defendant is ordered to pay the sum of $5,000 to plaintiff's counsel for attorney's fees and costs incurred by the plaintiff in connection with determination of paternity and the entry of an appropriate order of child support[2].
 (F) All arrearages including attorney's fees to be paid within 45 days of the date of the judgment.
Corradino, J.